We'll hear argument this morning in Case 23-1141, Smith & Wesson Brands v. Estados Unidos Mexicanos. Mr. Francisco. Mr. Chief Justice, and may it please the Court. Mexico asserts that American firearms companies are responsible for cartel violence ravaging Mexico. Its theory is that federally licensed manufacturers sell firearms to licensed distributors, who sell to licensed some of whom transfer to smugglers, who then smuggle them into Mexico, hand them over to cartels, who in turn use them to commit murder and mayhem, all of which requires the government of Mexico to spend money. Needless to say, no case in American history supports that theory, and it's squarely foreclosed by the Protection of Lawful Commerce in Arms Act. As to proximate cause, this Court has repeatedly said there must be a direct relationship between the defendant's conduct and the plaintiff's injury, but no such relationship exists if plaintiff's injury is caused by multiple intervening independent crimes committed by foreign criminals on foreign soil to inflict harm on a foreign sovereign. As to aiding and abetting, Mexico doesn't identify a specific crime, criminal, or criminal enterprise that defendants supposedly helped. Instead, it asserts that defendants are liable for every illegal sale by every retailer in America, because they know that a small percentage of firearms are sold illegally and don't do more to stop it. Again, no case in history supports that theory. Indeed, if Mexico is right, then every law enforcement organization in America has missed the largest criminal conspiracy in history, operating right under their nose, and Budweiser is liable for every accident caused by underage drinkers, since it knows that teenagers will buy beer, drive drunk, and crash. The First Circuit gravely erred in embracing that implausible theory and should be reversed. I welcome your questions. Mr. Francisco, as to the predicate exception, which federal or state law is your petitioner reputed to have violated? So my understanding, Your Honor, is that they're invoking the federal aiding and abetting statute to argue that we have aided and abetted the federal have knowingly sold firearms to straw purchasers, and that we aided and abetted that knowing sale. That actually raises a very important question about their allegation of knowing. I don't think it's relevant, because I'm willing to even assume a certain level of knowledge. I don't think it matters. But their theory of knowledge is that we actually know that retailers are selling illegally. I'd actually urge you to look at that 2010 Washington Post article that they incorporate into their complaint. That article talks about a particular retailer called Lone Wolf. In 2010, it was the number one seller of firearms that were found in Mexican crime gun scenes. And in that article, you actually have a quote from ATF that says that ATF has no basis to believe that Lone Wolf is doing anything illegal or wrong. Well, if the government doesn't know, how are we supposed to know? It reflects this convoluted theory that simply because the gun is found in Mexico can be traced back to a retailer. That means the retailer necessarily sold it illegally, and that we know that the retailer sold it illegally. Would this be a different case if there was a specific federal or state statute that you were known to have violated? Your Honor, it would be a different case. I would want to know more because I still think that depending on what they alleged, I would have very strong arguments on proximate cause and aiding and abetting liability. But it would certainly be a different case. Well, the reason I ask is because the exception is for knowingly violating a state or federal statute. And it would seem helpful in determining aiding and abetting and then eventually proximate cause if that comes up, if you knew which statute we were dealing with. So the complaint is a little bit vague on this. To the extent I understand it, they're looking at federal statutes that restrict the knowing sale of firearms to people who aren't authorized to purchase them. And then they're invoking the criminal federal aiding and abetting statute to claim that we are then liable for those illegal sales. I'm willing to assume for the because I don't think they come anywhere close to establishing aiding and abetting liability. And even if they did, I don't think they come anywhere close to establishing proximate cause. I'm sorry, counsel, but exactly what role I had difficulty telling from your brief does foreseeability play in your proximate cause analysis? So as this court has made clear in a number of cases, it's not that foreseeability is irrelevant. It's that foreseeability alone is not the standard. So it's necessary, but not sufficient. In addition, there has to be a direct relationship between the defendant's conduct and the plaintiff's imagery. And your honor, I think that the plurality opinion you authored in the Hemi group is directly on point. That is where a case where the plurality held that the city of New York couldn't sue a cigarette retailer for not filing the tax reports in order for the city to recover lost tax revenue. Because in between the city's injury of lost tax revenue and the retailer's failure to file the reports to the citizens of New York who illegally failed to pay their taxes. And that broke the chain. This is a much easier case. Here we don't have just one intervening independent crime. We have a multitude of intervening independent crimes. So even if they could establish aiding and abetting liability, and I don't think they even come close under Twitter, they couldn't establish proximate cause, which is the other requirement here. Counselor, it seems to me that the cases are a mess on proximate cause. And you're asking us in this case to choose among a variety of different explanations of it. I think, however, I try to break this down. I think their complaint is saying that the violation is selling to straw purchasers. And I think the risk in selling to a straw purchaser, and that's the known risk of that violation, is that that straw purchaser is giving or selling the gun to someone who can't possess it because the likelihood is that they're going to use that gun illegally. And that's the risk of the violation. And I think that that's what their complaint says, which is, now, I'm going to put aside the lack of the conclusory allegations. And I agree with your point that they don't really tell us which dealers are doing this, who they're aiding and abetting. There may be a lot of conclusory allegations, but the theory, I think, that they're advocating is, if you're selling to a straw purchaser, you know that the risk is that they're giving it or selling it to people who are going to cartel. So I don't know if this is a proximate cause case, or it really is what you say it's not, or that the allegations are insufficient for aiding and abetting. I think for us to go into proximate cause opens up Pandora's box. So I want to take one step back, Your Honor, because they're not alleging that my clients engaged in any illegal retail sale. None of my clients actually sell to consumers. The complaint says they aided and abetted. Justice Thomas asks you, what violation? I believe the violation, they claim, is that the dealers are selling to straw buyers. Sure. And I just wanted to be clear that I think that the chain of causation, I think it's relevant both to proximate cause and aiding and abetting. I think that the chain of causation under the statute doesn't start at the illegal sale because we aren't alleged to have engaged in an illegal sale. It starts with the conduct that they allege constitutes aiding and abetting the illegal sale, which is the way that we manufacture and distribute our firearms. But I also think that's relevant to aiding and abetting liability because we're not alleged to have aided and abetted any cartels or any illegal purchaser. We're alleged in this case, at least as they here, to have aided and abetted the retailers. And so they have to carry the argument that somehow we're liable for every illegal retail sale in America because we know that some small percentage of retailers may sell the firearms illegally and don't do more. Now I dispute that. Mr. Francisco, I just want to pause there for a second. Sorry to interrupt you. But just to follow up on Justice Sotomayor's question, put aside aiding and abetting. Assume for the sales, your clients aided and abetted the sale of guns to bad apple dealers, ones they knew or intended to even for them to sell on to people in Mexico doing bad things. They knew that. They knew all of that. How would you not have proximate cause in that hypothetical? So sure, Your Honor. And that is a huge assumption. But even accepting that assumption, for the same reason there was no proximate cause in Hemigroup, even if you assume that we're on the hook for that illegal retail sale, you still have a multitude of independent crimes in between that sale and injury to Mexico. You have the straw purchaser that gives it to the actual purchaser. You have a smuggle across an international border. I understand. But my hypothetical assumes that you know all that. Your clients know all that, maybe even intended. Now, whether their allegations of this complaint is sufficient, I'll put that aside. But if you know or intend all of that, then what? I still don't think that establishes proximate cause when you have an intervening independent crime. And I'll point you to Hemigroup, Your Honor. In Hemigroup, the underlying statute was the filing of the tax reports. The entire purpose of the tax reports was to allow governmental entities to collect tax revenue from cigarette sales online that weren't otherwise subject to sales taxes. But the plurality held that that independent intervening act still broke proximate cause. I think it goes back to the court's 1876 decision in the St. Paul Railway case, where you made clear that if there is a sufficient and independent. Your Honor, I think of the court as a collective body that operates across time. And it made quite clear way back in 1876 when you do have that and I'm quoting a sufficient and independent cause operating between the wrong and the injury that does break the chain of causation, even if it's eminently foreseeable. Just like many, many, many years later in the Hemigroup case, the court concluded the same, even though it was eminently foreseeable that the retailer's failure to file the tax reports could lead to lost tax revenue. Mr. Francisco, can I just put a point on this? Because I want to make sure I understand the line of questions you've been asked. So it seems to me as Justice Thomas began that when we're talking about the statute that was the violation at the beginning for the predicate, it has to be a statute that was specifically applicable to the sale or marketing of the product, the gun. Justice Sotomayor asked you, so that's the retailer selling it to the bad guy, right? Okay. That's where the proximate cause inquiry comes in. Your client, the theory, right? The theory is that your client under two, under example two, has aided and abetted as the manufacturer. Proximate cause doesn't appear in that portion of the statute. It's only in the predicate portion. So if we accept that framing of the theory, the framing of the complaint, we're really only asking about proximate cause, as Justice Gorsuch was asking you, between the retailer, the sale, and the harm ultimately caused to Mexico. And then we're looking at the chain of events that you're talking at right now. Sale to the bad guy, smuggled across the border, misuse. So I think I have two responses, Your Honor. The first is I actually disagree with how you framed it. But the second is even if I accept how you framed it, I still think there's no proximate cause. The statute says that there has to be proximate cause between our violation and Mexico's injury. Our violation is not the illegal sale itself. It's the actions that we undertake to aid and abet it, the violative aiding and abetting conduct. How does that fit in the statute, though? Your Honor, because I think the statute says it's a, the statute requires that, sets forth the exception where a seller has knowingly violated an applicable statute and the violation, referring to the seller's violation. But it's not just applicable statute. Statute applicable to the sale or marketing of the product. So that seems to me to refer to a specific statute relating to this manufacturer sale distribution of guns, not the aiding and abetting. Well, I think it's got to refer to our violation. It refers back to the seller's violation. And here the seller hasn't specifically, and this maybe goes to the confusion that Justice Thomas pointed out, but the seller's violation is not the actual retail sale. We're not retail sellers. The seller's violation here is the aiding and abetting of that retail sale. And I presume what they are invoking is the federal aiding and abetting statute, and they're trying to combine that with the actual specific sale. So I think there are all kinds of problems with their theory. Mr. Francisco, aiding and abetting is a form of vicarious liability. Why wouldn't you just say the aiding and abetting violation is the violation that is aided and abetted, which here, as Justice Barrett said, is the retail sale, say the sale to a straw purchaser? Sure, Your Honor. I think it's – I'm just trying to construct the statute properly, and I think as a matter of proper statutory construction, that's where you begin the proximate cause with our violation. But I don't really want to fight about it. So your violation as a matter of vicarious liability is the violation that the retail seller, you know, sells to the straw purchaser? Your Honor, I'm not sure that's right. But again, I'm willing to assume for the sake of argument that it is right, because I still think that there's no proximate cause in between – for – between the illegal retail sale and Mexico's injury off in Mexico, and I sure don't think that they've come anywhere close to establishing aiding and abetting liability. I've already explained why I think there are multiple independent crimes after the retail sale, in addition to the smuggle across an international border and the murder and mayhem committed independently by cartels in Mexico. To me, that is more than sufficient to break that chain. But in any event, I think that their theory of aiding and abetting liability is equally far-fetched. I think this is – So with reference to aiding and abetting, could you just explain to me the sort of structure of this industry? Who are these distributors? Are they pass-through entities? Are they completely independent? Might they be both? What's the – They're independent entities, Your Honor. It's possible that there might be some internal distribution, but by and large, a manufacturer makes the firearms. Then there are distributors who purchase the firearms from different manufacturers. Those distributors then sell firearms to retailers. Everyone in this chain is fully licensed. The retailers then are fully licensed and they sell to purchasers. The allegation is some small percentage of those sales are illegal, and we know it. Is your representation that the manufacturers really only deal with the distributors, or do you understand the manufacturers to be looking at and paying attention to the dealers, too? Your Honor, we're here on a complaint, and as far as the complaint alleges, it's simply the manufacturers going to the distributors, the distributors going to the retailers. Right. I'm asking from what you know of the industry and your client, is the manufacturer essentially dealing with the dealers, or is there like a big roadblock, which is in the form of the distributors? We're outside of the complaint now, so I want to be very careful because I don't 100% know the answer to all of your questions, but my understanding is that the manufacturers are not generally dealing with the retailers. You do have this tiered distribution chain where they're principally dealing with the distributors, the distributors to the retailers, and so on. I think that the reason this is such an implausible aiding and abetting theory is because I actually think this case is a lot easier than the Twitter case in a number of different respects. First of all, Twitter, you actually had a specific criminal, ISIS, you had a specific crime, the Reina nightclub attack, and the defendants were actually providing that product to that criminal. You don't have any of that here. Instead, their theory is that by simply knowing that some percentage of retailers may be doing something illegal, that somehow puts us on the hook for everything that the retailers are doing. This is kind of a common law area. You'd think that they could cite one case that comes anywhere close to that, but they don't cite a single case. Mr. Francisco, that's sort of what I'm a little confused about and I wanted to focus on, which is it seems to me that the core of your argument both here and in your brief has been that there's an implausible theory of aiding and abetting liability based on what they've alleged and no case in American history supports this theory of liability as if the question before us is evaluating the viability of Mexico's theory. What I'm looking at is a statute that I think really makes this case about the scope of the predicate exception, that it's not really an invitation to assess as a common law matter whether or not we think these facts allege aiding and abetting liability. Would you agree with me that the PLCA statute takes off the table theories of tort with respect to these kinds of manufacturers and really the only question is whether the statutory exception applies in this situation? Yeah, I think I would agree that we're arguing about what the meaning of the statute is, but the statute can only be triggered if they find a violation that's the proximate cause. Here the violation that they identify as aiding and abetting... I understand, but that proximate cause analysis is coming up in the context of an exception to the immunity that Congress has set forth. Is that right? Sure, yeah. I think that's important because the scope of that exception may not be coterminous with our understanding of aiding and abetting liability as a common law principle. In other words, you look at Twitter, for example, and you say, okay, is what is being alleged here the same as aiding and abetting liability as it was set forth in that statute? That was a Twitter case was about allowing for these kinds of claims and so what counts for aiding and abetting liability in Twitter may not be what Congress intended for this exception. I feel like we have to focus on where we actually are in this context in making this determination. Well, Your Honor, I think that's where I might very much disagree with the theory that you're articulating. I think that they do have to show a violation. They've alleged it's aiding and abetting. There's no aiding and abetting in the air. What Twitter purported to do was look at traditional aiding and abetting principles. I understand, but Twitter was a different kind of statute. We have said that when we're doing statutory interpretation, when we're thinking about aiding and abetting liability, it may not be the same in every statutory scheme. I guess what I'm just trying to ... This is not supposed to be a statement that is necessarily against your position. I'm just trying to understand the framing of this. It seems to me this is a statutory interpretation question about the meaning of what the predicate exception says, knowingly violated a state or federal statute. Aiding and abetting is in the examples. It's not even in the actual core statutory statement of what would qualify. Shouldn't we be focused more on trying to get a certain kind of claim? Well, Your Honor, to the extent I understand what you're getting at, first, I do think that you really do have to grapple with the aiding and abetting liability issue, and Twitter sets out the framework. Even if you want to take a step back and look at what Congress was getting at more broadly, Congress's entire purpose was to prohibit lawsuits just like this one. It was trying to prohibit lawsuits that had been brought by the city of Chicago, the city of Cincinnati, the city of Boston, on theories and seeking relief exactly like this one. So if you adopt my friend's position on the other side, you have essentially gutted Plocka. And remember what the larger purpose of Plocka was. It was actually to ultimately protect Second Amendment rights by preventing plaintiffs from bankrupting the industry through frivolous lawsuits. After all, the Second Amendment doesn't really mean anything if there's nobody from whom you can buy a firearm. Just to follow up on this, Plocka, as you call it, says that you've got to show a violation of a state or federal statute. And just as Thomas asked you, and I'm still not sure we've completely identified what that statute is, I think it's 18 U.S.C. 922, maybe 923. You agree with that? Your Honor, I... We don't know. I don't think the complaint was clear on it. We did speculate about that. We speculated about it in our brief. I think that might be the statute. And then trading and betting would be 18 U.S.C. section 2, I think. I think that's right, yeah. Okay. All right. I just want to be clear on what is being alleged. And then your friends on the other side make a good point about our precedent in direct sales, which I did not write either and is about eight years old, too. I want to give you an opportunity to respond to that. Sure. I will agree with him on one point, that direct sales is their single best case. And direct sales isn't even close. In direct sales, you had a manufacturer that was selling to a specific doctor in such massive quantities that there was no possible lawful explanation. And in addition, the manufacturer then further encouraged that doctor to buy more by offering massive discounts on bulk purchases. So to use the language of Twitter, you had both a very high degree of scienter and a very high degree of conduct and encouragement. Well, nothing like that here. That raises another question I had, and then I'll stop. But in terms of aiding and abetting under section 2 for 922, if that's what we're talking about, those are criminal statutes. And Roseman says that aiding and abetting in the criminal arena generally requires intent, not knowledge. You can make anything of that. Well, Your Honor, I think that because they don't come anywhere close on any standard, whether you call it knowledge, whether you call it intent. Remember in Roseman, the defendant was actually part of the drug transaction. The question was, did Roseman, in participating in that drug transaction, also know that one of his collaborators was going to shoot somebody? You don't have anything like that here. The other respect in which this is far different from Twitter, in a way that also highlights direct sales, is that in Twitter, the defendants there were far more active. We were here just a few weeks ago talking about algorithms. The way that algorithms work is that they match up the creator's content with the user's interest. So it starts out with ISIS's vile content. It surveys the billions of users on the platform, figures out which ones are actually interested in that content, and puts the two together. We're not doing anything even like that. This is an a force, you are a case of Twitter. Counsel, the complaint says that 2% of the guns manufactured in the United States find their way into Mexico, and I know you dispute that. But is there a number where your legal analysis might have to be altered? If it's 10%, if it's 20%? At some point, the proximate cause lines that you draw really can't bear the weight of the ultimate result. So Your Honor, I take their complaint as it comes. If we're talking about proximate cause, I don't think that the percentage would actually matter when you have a multitude of intervening independent crimes. In Hemi, for example, I don't think it would matter whether the city was losing, whether everybody was not paying their taxes in New York City, or just a small percentage were not paying their taxes in New York City. What mattered is that you had the independent decision of the New York City taxpayers not to pay their taxes that broke that chain. Here you have a multitude of intervening independent crimes. So I don't think that percentage would matter at all on my part. Well, I mean, at some point it must matter. I mean, I understand you don't want your theory about the different steps. But if it ends up that most of your product or whatever number you want to get to change in your view ends up there, you've got to know that. And if you know that, do you still have to go through the intricate step by step by step? Or can you just say, this is what they make, and pick whatever number you want. 70% of it ends up in Mexico. I still think you do have to go through that analysis, Your Honor. But even if you disagree with me, I'm willing to accept the allegations in their complaint and the number of 2% and to be quite confident that that is not enough for proximate cause, particularly when their theory is that simply because a firearm was found in Mexico at a crime scene, and can ultimately be traced back to a particular retailer that sold it in the first instance, that means that the retailer illegally sold it, and that we knew the retailer illegally sold it. Even the ATF and the federal government rejects that theory. Thank you. Justice Thomas? Mr. Francisco, in direct sales, there was exactly that, a direct sale to a doctor. And the seller worked closely with the doctor to work around the limitations. In your brief, you summarized the chain that you've mentioned or alluded to a number of times. Would you just list the chain for our benefit? Sure. It starts out with a licensed manufacturer, a manufacturer that the federal government says is allowed to make firearms. It then distributes its legal firearms to licensed distributors, distributors who the federal government says are allowed to distribute them. They then sell to licensed retailers, retailers that the federal government says are allowed to retail. Those retailers, some very small percentage of them, unknown number, but some small percentage of them, transfer those firearms illegally to straw purchasers. Straw purchaser then hands it over to the actual purchaser. You then have a smuggle across an international border, yet another violation of law. The smuggler then presumably gives it to the cartels who are illegally possessing the firearm in Mexico under Mexican law, as my friends have described it. Then the Mexican cartels engage in murder and mayhem against the good people of Mexico, all of which in turn causes the Mexican government to have to spend money to respond to that murder and mayhem. With respect, there's not a single case in history that comes close to that. They don't even cite cases that find a manufacturer, I think, ever liable for the unlawful criminal misuse of its products other than the cases that PLACA was meant to prohibit, and perhaps other than the Avis case, the Florida Supreme Court case. But they certainly don't cite anything that comes close to that chain of causation, which is more extreme than the cases that PLACA was meant to prohibit. Justice Alito? Justice Sunower? Justice Kagan? So suppose, Mr. Francisco, and this is not the complaint in this case, so I'm making changes to it. Suppose there's a manufacturer and it deals directly with a network of dealers, or there's a wholesaler and it deals directly with a number of dealers. I think one of the defendants in this case is a wholesaler. Either way, let's assume you have a manufacturer-slash-wholesaler that deals directly with a network of dealers. And suppose that that manufacturer does have knowledge that a particular dealer does more than the usual share of straw transactions. And suppose that that particular dealer does and also knows that more than the usual share of guns wind up in Mexico, and particularly at Mexican crime scenes. So that the manufacturer, in the way that manufacturers do, I think, when they're dealing with dealer networks, they're paying attention to their dealers and they're trying to figure out whether there's a dealer whose sales are kind of out of kilter with the rest. And they think, yes, I have a dealer whose sales are out of kilter, they're doing more straw transactions, they keep on selling to people who are taking the guns to Mexico, and particularly to people who are leaving the guns at Mexican crime scenes. Is that enough? Your Honor, that's obviously very different, as you acknowledged. Even in that case, if the manufacturer was simply treating all of the dealers the same, including that dealer, then I don't think you would have crossed the line into aiding and abetting liability. Treating them the same, what does that mean? Say they have a policy that says, look, I sell firearms, any dealer that wants to purchase my firearms, I'm going to sell them to them. Okay, well, they are treating them the same. I mean, from one perspective, that's the problem that they're treating this rogue dealer the same as the good dealers, right? Even though they know that the rogue dealer is, in fact, a rogue dealer. Isn't that enough of a problem to bring you in? One thing that's not, that is the same, is that we're at a 12 v. 6 stage. Sure. And, Your Honor, I think I'd invoke Twitter, where the social media platforms knew to a metaphysical certainty that ISIS was on its platform doing nefarious things. And that knowledge to a metaphysical certainty wasn't enough. If you were simply treating your customers all the same and you were indifferent to what they were doing, I think this case is a lot easier in terms of various perspectives. Yeah, I guess that's the question. Is the case that I gave you, is it a Twitter or is it a direct sales? It seems to me more like a direct sales. I'm a manufacturer. I have a dealer network. I know that there's one dealer that's way off the beaten track and doing things that are really different. That seems a direct sales. And if I can explain why I think that direct sales is far more extreme than you're hypothetical, remember, in direct sales, it wasn't just that this doctor was purchasing so much that there was no possible explanation. There was no issue. Nobody even argued about whether he was, the direct sales was treating everybody the same. But in addition, what that manufacturer was doing was explicitly encouraging that doctor who knew it was already illegally prescribing to do it even more. There's an example in the fax, for example, where the doctor orders two batches of pills, one for a thousand pills and another for a hundred pills. And direct sales comes back and says, don't do that. I'm just going to cancel your hundred order because I'll sell you another thousand pills at this massive discount. So you not only had a high degree of knowledge, you had a very high degree of conduct with the manufacturer actually encouraging the over sales. It's necessary to direct sales, but there's a kind of encouragement in addition to a realization that your products are being used in this way for these purposes. I think that's the necessarily implication of Twitter, where you had knowledge to a metaphysical certainty that one of your customers was doing something bad. But what the opinion makes clear is that simple knowledge doesn't get you across the line unless you're in addition acting in an unusual ways. How about if the conduct is like, and we do this for everybody. Don't get me wrong. We do this for everybody, but it's particularly maybe important to Mexican gang members is that we make it so that you can easily scrape off serial numbers. And we construct a set of products that are obviously useful in their characteristics for cartel members. Well, Your Honor, the more you ratchet up the facts and make them cartel specific, I think the closer you do get direct sales. Those allegations are in this complaint, right? That the manufacturers have basically designed and manufactured a set of weapons with a set of characteristics that are peculiarly useful for criminal activity. And that's where I don't think you would be getting anywhere close. If we simply make our firearms in a way that the general public likes, and we allow whoever wants to buy our firearms, buy our firearms. And we know as in Twitter, that some percentage of them are going to do something wrong. That's not the type of affirmative action that gives rise to aiding and abetting liability. After all, the social media platforms in Twitter did know that ISIS was on their platform. They were much more active than we are in the ways that I've already described. This court set as a matter of law on a motion to dismiss that that wasn't even close enough because there was no unusual treatment of ISIS relative to any other customer. And there was no affirmative conduct towards ISIS. Justice Worsitch? Just one question. Is there any reason for us to reach the proximate cause question if we conclude for aiding and abetting that you win? If you rule for us on aiding and abetting, that will completely dispose of the case. The reason to also address proximate cause is because it's an extraordinarily important issue that I think applies in many different contexts, which is why there's such a broad range of amici in this case that go well beyond the firearms industry. So while you could completely resolve it on aiding and abetting, I would urge you to address proximate cause as well. Justice Jackson? So, Mr. Francisco, I'm just trying to understand what you mean by resolve it on aiding and abetting liability. Don't we have to have a conception of aiding and abetting liability that is specific to this statute? You seem to be drawing on others. And I thought we took a statute by statute approach to aiding and abetting liability. We've held as much. We've said that before. Well, Your Honor, in Twitter, you were applying aiding and abetting principles that arose in the context of a murder when you were talking about social media platforms. I think the whole point of Twitter was that there is a set of general aiding and abetting principles, and that is the law that informs what aiding and abetting liability is. I don't even know how you would do this kind of statute-specific aiding and abetting liability outside of the general principles of aiding and abetting. Well, I thought we were only looking at aiding and abetting to the extent that Congress mentions that in an example in the statute. So what we're really doing is trying to understand what Congress intended with respect to the exception that it put in this statute. And so to the extent that it references aiding and abetting liability in one of the examples, that is just to illuminate the meaning of the statutory terms that exist there, right? I mean, it's sort of odd to me that suddenly a common law of aiding and abetting liability is coming in to, in your view, be dispositive of how we think about this case. Sure. Well, I think that it's an example that the reference to aiding and abetting in the statute is an example of a violation that then triggers the statutory exception in the proximate cause analysis. So you have to understand, then, what it means to aid and abet a particular crime. Again, I don't- That's Congress intended it for the purpose of this statute. Well, and I think it's not that plausible to say that Congress had some completely idiosyncratic view of what aiding and abetting was for the statute, as opposed to just looking to the principles like this court looked to in Twitter, which are just the basic aiding and abetting principles that are prevalent in the law. Can I ask you about the proximate cause? Because I'm still a little confused about where you start your proximate cause analysis. I listened, as you discussed with Justice Thomas, the series of steps from your clients to the alleged ultimate harm. But it seemed to me that the first moment of illegality in the chain, as you articulated it, was the retailers selling to the straw purchasers. Am I right about that? You say your clients do things that are legal. They sell to other legal buyers, and et cetera, et cetera, until we get to that straw purchaser point, right? That is the first moment of illegality, but I don't think that's the sole step relevant to a general proximate cause analysis. Right, but we don't have a general proximate cause analysis. We have a statute, and the statute makes clear that we're starting with an action in which a manufacturer or seller of a qualified product knowingly violated a state or federal statute applicable to the sale or marketing of the product. So it seems to me that the first step, given this statute, is the moment of violation, of illegality, as opposed to some theoretical original point. And my answer to that question is no, but it doesn't matter. No, I understand you think you make it anyway, but I'm just trying to understand why you're insisting that it's way back here. Because what the statute says is there has to be a proximate cause between the defendant's violation. Our violation is not the illegal sale itself. We don't sell to consumers. But you say you don't violate at the beginning, so I don't know what your violation is unless it's the point of illegality. It's the aiding and abetting. That is the whole aiding and abetting theory. Thank you. Thank you, counsel. Thank you, your honor. Ms. Stetson? Mr. Chief Justice, and may it please the court, Mexico's complaint pleads that petitioners aided and abetted violations of specific federal gun laws, and that those violations proximately caused Mexico's harm. That satisfies PLACA's predicate exception. First, the complaint details that petitioners deliberately supply the illegal Mexican market by selling guns through the small number of dealers that they know sell a large number of crime guns and who repeatedly sell in bulk to the cartel traffickers. Petitioners' arguments ignore these allegations. Next, as the court said in Twitter, an aider and abetter is liable for harms that were a foreseeable risk of that violation. That framing, foreseeable risk, is the proximate cause question. As this court put it in Bank of America, does the harm alleged have a sufficiently close connection to the conduct the statute prohibits? The answer is yes. The laws broken here are designed to keep guns out of criminals' hands. Those violations put guns in criminals' hands, and those criminals harmed Mexico. Petitioners' arguments would rewrite PLACA and proximate cause law far beyond this case. Petitioners argue that independent criminal acts sever the causal chain. But an independent act, criminal or not, only breaks the causal chain if it is not foreseeable. These acts were foreseeable. Petitioners argue that Mexico's injury is not direct, but their directness argument borrows from cases involving indirect victims. Mexico is not an indirect victim. We are here at the beginning of this case. This court need not vouch for Mexico's allegations, but it must assume they are true. And the issue at this stage is not whether every aspect of Mexico's complaint survives, but whether any of it clears the predicate exception. Mexico should be given a chance to prove its case. I welcome the court's questions. How is your suit different from the types of suits that prompted the passage of PLACA? Our suit is different, Justice Thomas, because the types of suits that prompted the passage of PLACA specifically did not allege that the manufacturers had violated any law. So if you look, for example, at the Third Circuit's decision in the city of Philadelphia, the Illinois Supreme Court's decision in the city of Chicago, each of them specifically made the point that those manufacturers were not alleged to have violated any federal or state statute. They were being held liable for actions solely caused by criminals. And that's the important balance that this bipartisan act struck. If an action was solely caused by criminals, manufacturers of guns, like any other product, wouldn't be held liable. Well, it seems as though the only connection or the difference would be the allegation or the assertion that you have an aiding and abetting problem with respect to the manufacturer. You could have done that in the other cases, couldn't you? I don't know that they could have, and they certainly didn't. And PLACA, more to the point, could have also barred, as many states did, all lawsuits against manufacturers. Many states barred lawsuits by cities. Many states barred lawsuits by all manufacturers. PLACA didn't. And what PLACA did was to preserve exactly these types of claims. You asked a question about the specific allegations of illegality. I want to direct you to paragraph 249 of the complaint. There is a list at paragraph 249 that includes 18 U.S.C. 922, several different subparts, A6, D1, 923 G1, 924 A1A, and those map closely onto the predicate exception we're talking about. That's 18 U.S.C. 922 A6, 922 T1, 922 M, 924 A1A, 923 G1A. Each of those are specified in the complaint, and the manufacturers and distributors in this case are alleged to have aided and abetted all of them. Have any of these violations been violations that ATF has pinpointed? They have not been violations that ATF has pinpointed, and that's a point that the positioners are fond of making. I think the issue with ATF, as the complaint alleges, is that ATF, and you can find this at paragraphs 126, 129, 133, ATF, just because of its resources, is only able to look, even every year, at about anywhere between 3 and 10 percent of licensed dealers and manufacturers and distributors. And if PLACA, again, had wanted ATF to be the sole arbiter of this, it could have barred cases altogether, it could have required a conviction, it could have required the stripping of a license before any of these allegations were allowed to go forward. It didn't do any of those things in the predicate exception. Counsel, in his argument this morning, and also in his brief, Mr. Francisco focused on two particular cases, the Twitter case, of course, and you engaged with that in your brief, but also Hemi Group, and you cite that once in a string cite at page 42 of your brief. I wanted to give you an opportunity to say a little bit more about that. Certainly. So, Hemi Group, of course, pertains to the proximate cause issue. And Hemi Group, I think, is in a line with all of the cases that talk about what my friend, Mr. Francisco, calls direct harm. And that's something that you heard a lot in his argument. Direct came up a lot. Independent came up 13 times. Direct harm, if you look at Hemi Group, if you look at Associated General Contractors, Holmes, Anza, Bridge, there is a list of proximate cause cases. And if you look at each of them, what you will find is that the issue there was that the victim who was bringing the complaint was an indirect victim. So, this court, like many of us, finds it hard to speak with one voice on proximate cause. One of the few times it has is in Lexmark. And what Lexmark says is the reason for that directness requirement is that there ordinarily is a discontinuity between the injury to the direct victim and the injury to the indirect victim, so that the latter is not surely attributable to the former. That, I think, is an important component of the proximate cause argument. And I want to touch on this independent idea, because it came up so much. As I said in the opening, an act that is independent can still be foreseeable. It's when an independent act is unforeseeable that you have the intervening cause that breaks the causal chain. So, Mr. Francisco mentioned that 1876 case that Justice Gorsuch did not write about Milwaukee Railroad. That is the case that says the primary cause may be the proximate cause of a disaster, though it may operate through successive instruments, as an article at the end of a chain may be moved by a force applied to the other end. So, it's not a question about one step or a causal chain. It's a question about whether something breaks that chain. Hemi was an example of something breaking the chain, because you had unlawful contact over here and an injury over there, and the two weren't connected by anything other than a very articulate series of steps. The injury and the conduct were very different. You know, it's nearly impossible to say that something's not foreseeable in a chain. It doesn't help me when people talk foreseeability. I'm much more helped by the restatement third of torts that basically says you impose liability for harms within the scope of the risk that made the defendant's conduct wrongful in the first place. That makes much more sense, because as I started earlier with Mr. Francisco, we know that a straw seller is going to sell to someone who is going to use the gun illegally, because if they weren't, they wouldn't use the straw purchaser. And that illegal conduct is going to cause harm, and harm like this, that the gun is going to be used in some way to injure people. Correct? That's correct. And that basically is much easier than saying that all foreseeable harms are, you know, you're responsible for all foreseeable harms. You're only responsible for those that your wrongful conduct causes a risk about. That's exactly right, Justice Sotomayor, and that's why I started with that reference to Twitter, because when Twitter talks about the aider and abetter being responsible for harms that are a foreseeable risk of the conduct, that's the closest thing that I've seen that comes to encapsulating what a proximate cause is. Now, can I go back to what's troubling me? You have the manufacturers aiding and abetting, in your theory, by producing guns that are singularly attractive to the cartel, because they're designed in a particular way that cartel members like, because they're showing. They're making erasable serial numbers, which obviously are attractive to criminals, because every criminal would like to erase the serial number if they can. So that's what you claim is aiding and abetting, but what are you claiming interstate, the distributor wholesaler, did? Other than selling the product, they don't design it. They didn't do any of the, they didn't design it. They didn't have anything to do with that. They just have a product they're selling. So how do we make, how are your allegations enough with respect to interstate? And if we were to say they're not enough with respect to interstate, doesn't that break the causal connection with the manufacturers? Justice Sotomayor, the complaint actually details six or seven different examples of how the manufacturers are actively participating in the illegal market. I'm accepting that. I'm asking, tell me what it says that the distributors are doing. What it says the distributors are doing, including the one that's named in this complaint, are knowingly supplying the dealers who we know sell unlawfully across the border. But knowledge is not enough. We have repeatedly said mere knowledge is not enough. You have to aid and abet in some way. You have to intend and take affirmative action to encourage what they're, not to encourage, but to participate. What this court said in Rosemond is a person who actively participates in a criminal scheme, knowing its intent and character, intends that scheme's commission. That's the criminal aiding and abetting statute. Yeah, that is the standard. That was the question I wanted to circle back with you on, Ms. Stetson. If 922 and 3 and 4 are your predicate violations, and aiding and abetting under 18 U.S.C. Section 2, I think, would then be your aiding and abetting hawk. Those are criminal statutes, and the mens rea under Rosemond is intent, right? The mens rea under Rosemond for aiding and abetting in the criminal context would be intent. And you're invoking criminal statutes, so is that the standard you have to meet here? It's the standard we have to meet, but just as in Rosemond, if you actively participate knowing the scheme, then you can infer an election. You can infer an election, particularly at the motion-to-dismiss stage. And if I could, I want to be pretty specific about some of the allegations in the complaint, because what I heard this morning was that the allegations are vague and so forth. I want to point you to a few particular allegations. Two of them are at paragraphs 122 and 146, and this has to do with trace data. Defendants are alleged to regularly receive... I'm sorry? Paragraphs 122 and 146 I'm starting with. Regularly receive even more direct information about problem dealers. Trace requests from ATF and other agencies alert defendants that guns they sell to specific distributors and dealers are being recovered at crime scenes. Paragraph 146, authorities have repeatedly identified and recovered defendants' guns in connection with notorious gun trafficking rings. Paragraph 232, defendants are aware that specific networks of distributors and dealers they were supplying were consistently channeling their guns. Paragraph 233, Century Arms received communications from ATF. Those trace requests revealed that specific distributor and dealer networks were disproportionately associated with those guns. Paragraph 234, all of the other defendants have access to the same information. That is exactly the kind of specific allegation in the complaint at this stage that satisfies a motion to dismiss. Those statements aren't allegations of violations of the law, correct? I mean, those statements just go to whether or not the defendant had knowledge that at the end of the day, some dealers might be doing something wrong, these guns that they're selling are ending up in the wrong hands. But I took the statutory language here to be requiring more in terms of violation on the part of the defendants in this case. It certainly requires, Justice Jackson, a knowing violation. But as far as these allegations go, what these allegations show is that the dealers, a small number that is responsible for the large number of guns, are knowingly violating federal laws and that these suppliers, these manufacturers and the distributor, know that it's happening and continue to actively supply. What you don't have is particular dealers, right? I mean, there are lots of dealers and you're just saying they know that some of them do. But which some of them? I mean, who are they aiding and abetting in this complaint? There are a number of dealers that we do know are responsible for selling a great number of crime guns into Mexico. There's the Washington Post article that the complaint mentions. That names eight or ten different dealers by name, most of which are still very actively in the business. And more to the point, again, we are here at a motion to dismiss. What we have alleged is that these manufacturers know from ATS exactly what dealers are the problem, are the rogue dealers. So the hypothetical that you gave Mr. Francisco, Justice Kagan, is not a hypothetical. That is actually this case. The allegations in this case establish for purposes of getting past the motion to dismiss on the predicate exception, as Justice Jackson mentioned, that there are allegations of aiding and abetting violations of federal laws. And I want to get back to a question that Justice Barrett asked as well about what the violation is, because I think there's been some noise in the data. Ms. Stetson, before you do that, could I just ask you something related to the point you were just discussing? Are there any allegations in the complaint that the petitioners knowingly sell to specific red flag dealers? Yes. If you look at paragraph 247, and I'll read it because I think this one is important. Defendants supply dealers with all the guns they can pay for without any public safety conditions, even if a gun dealer has been repeatedly found to have violated gun laws, been indicted, its employees have had federal gun licenses revoked, or has repeatedly supplied cartels in suspicious and obvious sales to traffickers, including repeated bulk sales. That is an allegation that goes directly to specific rogue dealers. And that gets us, I think, to the Twitter direct sales dichotomy. What Mr. Francisco says is that Twitter was very actively managing something. Twitter was actively managing, to the extent it was managing anything at all, its algorithms. And what this court said in Twitter was that that kind of starting the platform, sending it out into the world, and standing back and watching, which was the phrase in Twitter, is not enough. What you need is active, culpable participation. The active, culpable participation here is continuing to sell guns to rogue dealers that you know are the problem dealers. You haven't identified the dealers. Justice Alito is asking you about specific red flag dealers, but that paragraph doesn't identify dealers. And it seems to me that that's one of the distinctions between this case in direct sales, and for that matter, this case in Twitter. Let's talk about Twitter. There was a specific rogue actor, ISIS, and there was a specific attack in France. And so the attempt was to draw the line between them, and we said it wasn't enough. In direct sales, there was a specific manufacturer, pharmaceutical company selling to a specific doctor, causing specific harm. And Justice Alito asked you what specific red flag dealers there are. You haven't sued any of the retailers that were the most proximate cause of the harm. You haven't identified them that I can tell in the complaint. Justice Barrett, there are many, many paragraphs that specifically identify rogue dealers in the complaint. If you look at approximately paragraphs 147 to 203, they identify specific dealers that have been found to have sold guns in bulk to traffickers that go across the border. If the question is, you haven't named in paragraph 247, which says that these manufacturers know that they're selling to dealers who sell to cartels, I think that is pushing a little bit past what is necessary for drawing reasonable inferences from a motion to dismiss. But I want to pause, too, on Twitter and direct sales. Direct sales involved an entity that was selling large quantities of morphine to a doctor. The entity was licensed. The doctor was licensed. And if you look at direct sales, what direct sales says is that the quantities that were at issue were in line with that defendant's marketing practices. There was nothing unusual about the quantities at issue there. What was unusual in that case and what is different in that case is that that direct sales manufacturer did not know that that specific doctor was a problem. It had been put on notice that there were other doctors who were selling lots of their products to people who shouldn't be getting them. But unlike this case, where these manufacturers and the distributor are alleged to know who the dealers are and what problems they are causing, the manufacturer that was held liable for criminal conspiracy in direct sales didn't know anything about that doctor. All it knew was that the doctor kept sending them legal order forms and they kept fulfilling the orders. That was direct sales. This case is much like direct sales, if not stronger, for that reason. What do you do with the suggestion on the other side and in the amicus briefs that your theory of aiding and abetting liability would have destructive effects on the American economy in the sense that, as you've read in the briefs, lots of sellers and manufacturers of ordinary products know that they're going to be misused by some subset of people. They know that to a certainty, that it's going to be pharmaceuticals, cars, you can name lots of products. That's a real concern, I think, for me about accepting your theory of aiding and abetting liability. Relatedly, you've referred often to the motion to dismiss. Of course, as you're well aware, getting past that is often the whole thing. I don't think we can just rely on the motion to dismiss. But the broader point, I'd be interested in your reactions, how we rule for you but don't cause that problem that is identified with great force in the briefs. Sure. So let's take Budweiser as an example. As you heard Mr. Francisco say today, if Budweiser had a practice, was alleged to have a practice of selling bulk quantities of Bud Light to liquor stores that were arranged next to high schools and it was selling more and more into those high schools, knowing that those liquor stores were regularly serving underage students and in fact, the Bud Light designed it to put out a new can that says, best prom ever and sold it right into that high school. That is the allegations in this case. If you have a product manufacturer of a dangerous product that is alleged to have done all of the things knowing who they're selling to and what is being done with that product, then and only then, I think that product manufacturer has a problem. If you look at the examples that are given in PLACA that aren't at issue in this case, the examples that the congressmen and senators were concerned about in PLACA were when a car dealer sells a car to someone who later drives drunk, when Campbell's is sued because someone is killed with a soup can. Those are the things that PLACA was concerned about. This case marches through in detail allegations taken as true at this stage that these manufacturers know that they are selling a dangerous product to specific rogue dealers who are selling to straw purchasers for the cartels across the country. What if a beer manufacturer knows that the per capita beer sales in a small college town are 50 times more than another town without a college there? Is that enough? I don't think that alone would be enough. You do have allegations in this complaint that the number of dealers that have arranged themselves along the border of Texas and Arizona of Mexico are vast. I don't think that itself would be enough. It would be you know the dealers are there, you know what they're selling, you know who the bad apple dealers are because we're not talking about every dealer in the country. We are talking about a small percentage of retailers responsible for about 90% of the crime guns that are found. Those retailers in that college town, if you plug in that hypothetical of Budweiser and Budweiser was marketing in with some kind of you know best first year homecoming ever, then you would again have the problem. But you'd have to have each of those specific allegations in the complaint that you have here. Ms. Stetson, I guess what I'm concerned about, you talked in response to Justice Kavanaugh about what PLACA was about, what it was getting at, and I really thought as the statute itself says that it partially at least is about Congress protecting its own prerogative to be the one to regulate this industry. That there were concerns and the statute itself says that you know we're worried that tort suits are an attempt to use the judicial branch to circumvent the legislative branch of government. And to me when you think about that as being the reason why Congress wanted to have immunity in this area, and I'm starting from the I'm sure consensus view that we're trying to do what the statute wants, I think when you think about that the predicate exception makes perfect sense to the extent that there's a violation of a state or federal statute at issue. Because Congress says we want to be the ones to regulate, but in this particular situation in which a tort suit aligns with a clear violation of the law, then we don't worry that we have judges and the common law system dictating what people can do. I worry that without that clarity in a complaint like yours, where we don't really see exactly how the manufacturers are violating a particular state or federal law, that we're running up against the very concerns that motivated this statute to begin with. So can you speak to that? Sure. Justice Jackson, I think if you look at the paragraphs, let's call it 203 to 250 of the complaint, which pertain exactly to the violations of federal law that we started with, all of the specific statutory violations, 922 subparts, 920C, 924. What you will find is that there are plentiful allegations that these manufacturers by knowingly selling to the rogue dealers that they know are selling to straw purchasers are aiding and abetting that violation. Part of the problem that we were having... I guess my point is that Congress didn't want like general aiding and abetting concerns to be what is imposing duties on these manufacturers. And if you look at your lawsuit and what you're asking for, you're asking for changes to the firearm industry safety practices. You say not putting these kinds of constraints is a thing that should give rise to liability, the distribution practices, the marketing, all of the things that you asked for in this lawsuit would amount to different kinds of regulatory constraints that I'm thinking Congress didn't want the courts to be the ones to impose. So let me answer the aiding and abetting liability point first, and then I want to answer your remedies point because I think that's particularly important. Aiding and abetting, of course, was specifically contemplated in PLACA in the first predicate exception itself. Any case in which the manufacturer or seller knowingly made a false entry, et cetera, et cetera, or aided, abetted, or conspired with any person in making any false or fictitious statement. Aiding and abetting is baked into this. You don't read that to be very, very closely tied to the record keeping violation, the particular statutory violation that's also mentioned. No. I mean, the predicate exception begins by talking about the action in which the manufacturer knowingly violated and the violation was a proximate cause, including the exceptions that are mentioned. So aiding and abetting these violations of federal and state statutes pertaining to guns is exactly what this exception was built to do. That is why it was carved out in this bipartisan legislation. But on your remedies question, one of the difficulties, I think, for all of us is that we're here so early. This is a complaint that has asked for a number of different remedies, including a number of different types of injunctive relief. And one of the things that you heard the petitioners and a lot of their amici in their briefs complain about is what these remedies might do. That is for the district judge on remand to make sure that the judge equitably crafts a remedy that is designed to limit the harm to Mexico. Mexico is not trying to legislate gun use in the United States. I understand that. I guess I'm just wondering whether the PLCA statute itself is telling us that we don't want the courts to be the ones to be crafting remedies that amount to regulation on this industry. That was really the point of the entire thing. And so to the extent that we're now reading an exception to allow the very thing that the statute seems to preclude, I'm concerned about that. Justice Jackson, if PLCA had wanted to preclude any lawsuit against a manufacturer, including for instances where the manufacturer had committed a wrong, it could have done that, as so many different states, in fact, did. What PLCA did in this effort, which, as I mentioned, was joined by members of both parties, was to carefully carve out circumstances where the manufacturer or the seller was alleged to have done something wrong. The thing they were concerned about was lawful design and manufacture and sale of product and injuries solely caused by others. That is replete throughout the purpose section of PLCA. PLCA could have been designed quite differently. It was designed this way for a reason, so that harmful actions by manufacturers and sellers breaking the law could continue to be remedied. That was exactly the point. You've mentioned about four times that it was bipartisan. What's the relevance of that to our interpretation? I haven't gotten to 13 times yet, but four will do. The fact that it's bipartisan points out, particularly in this climate, that what was being challenged there were really unusual lawsuits that really weren't showing up in any other part of the economy against the manufacturers of a lawful product, selling their product lawfully, distributing their product lawfully, where no allegations were made in those prior lawsuits about unlawful behavior. That was what PLCA carefully carved out. What it left, among other things, were actions for things like negligent entrustment, product liability. Product liability is interesting, by the way, because you probably noticed this as well. Product liability specifically says you can sue for product liability, but if it was a criminal act, then that act becomes the sole proximate cause. That, of course, is very different from the violation of which is the aproximate cause, which is what you see in the predicate exception. I think that language difference is very important. Thank you, Counsel. I'd like to ask you pretty much the flip side of the question I asked your friend on the other side, which you allege that 2% of the guns manufactured in the United States are made in Mexico. I assume the volume of that is critical to your argument. I just want to know how much is enough, if it's 1% or a more miniscule amount. Where's the floor? 2% is always a question that begs the question of what. Here, what you have is data in the United States. You have 697,000 of defendants' guns. Remember, this is not the entire industry we're here talking about. Up to 600,000 defendants' guns are likely trafficked into Mexico every year. That's your 2%. I think the issue is not so much whether it's 2 or 10 or 70. It's do these manufacturers know who the rogue dealers are and what they're doing. This complaint in all of those paragraphs that I read to you earlier and many others around them specifically says these manufacturers know the trace data that show the dealers, that show the bulk sales that are being made to traffickers who come in repeatedly over a short period of time and bring the guns into Mexico where they're found at crime scenes. That, I think, more than percentage is important. You emphasize, you have a number of criteria or examples. The gun says this or it looks like a military weapon and it has an American flag. Zapata's quote about better to die on your feet than live on your knees. I mean, those are all things that are not illegal in any way. There's some people who want the experience of shooting a particular type of gun because they find it more enjoyable than using a BB gun. And I just wonder exactly what the defendant, the manufacturer, is supposed to do in that situation. You say no, he shouldn't be marketing a particular legal firearm because they're going to go into Mexico at a higher percentage than others? Mr. Chief Justice, I think it's not so much that the defendants are designing a particular gun. It's that what the complaint alleges is that they are designing certain guns to target the Mexican market, including the cartels. So if you take the example that you gave, this is paragraph 215, Colt produces three models of guns that it specifically targets to the Mexican market. The Super El Jefe, the Super El Grito, and the Emiliano Zapata in 1911. These are coveted by the cartels, and you can see evidence of this as paragraphs 217, 218, 219, 220, and they are smuggled into Mexico in volume, which you can also find. Do you know what the percentage of those guns that are sold in the United States compared to the ones that are found in Mexico is? I don't know, but again, the percentage, I think, is less important than the allegation that they are smuggled into Mexico in volume and coveted by the cartels, including being found on the person of many cartel chiefs who have been arrested. Thank you. Justice Thomas? If there's no earlier finding of a violation, how is that done within the context of a civil suit like this? If there's no earlier finding of a violation, because of course, as I think you're getting at, the predicate exception doesn't require one. There's another exception that does. I think what you would find are that at the motion to dismiss stage, the question is simply, has there been a sufficient allegation of aiding and abetting in order to get you past the predicate exception? Now, we talked about how we are here early. There are actually still other motions to dismiss to be addressed. But it has to be aiding and abetting of something. Aiding and abetting the violations, including of straw purchases. So it is the violation that you say in your complaint, there is a violation, but there's been no finding of a violation. How do we know there is a violation? I think what the district court would determine at summary judgment, if the evidence comes back and says, for example, these manufacturers simply had no idea what their distributors were doing or who their guns were going to, or these dealers were doing everything by the book and they are not responsible for the straw purchases that kept coming into their stores. If you had that evidence, then on summary judgment, as has happened before, the court would say, we can't find the predicate exception met here. So let's say I am the alleged straw purchaser or the retailer who sells to a straw purchaser. Now you have found that I have violated the Gun Control Act, right? And my point is, how do you make that finding within the context of this suit? Justice Thomas, within the context of that suit, I think you would take discovery from the dealer and ask the question, because remember, the predicate exception goes to knowing violation. Ask the dealer what it knew when it sold, for example, as has been alleged in the complaint, dozens of guns over a two-month period to the same person. The evidence at summary judgment will flush out some of these questions. So you are saying you can find a violation of selling to a straw purchaser within the context of a civil suit against the wholesalers and the manufacturers? I think maybe where you and I are parting is on the issue of finding a violation. We've alleged those violations, specifically in the complaint. As far as finding the violation, I think what the district court would do on remand after discovery, provided we get past the other motions to dismiss that are pending, after discovery would be to ask the question, has the evidence pointed to actual violations? If you take the Arcadia, California case, that was a case in which at the summary judgment stage, some defendants were dismissed because there was not evidence that they were acting unlawfully. Others were kept in because there was evidence that they were acting unlawfully. So that might be the best example of the dichotomy you're talking about. Wouldn't you run into at some point a due process problem as far as the people you allege to have violated the Gun Control Act who have not been charged with that by ATF and proven to have done that by the government? No, I don't think you run into a due process problem precisely for the reason I think you pointed out a couple minutes ago, Justice Thomas. There's no requirement of a conviction. And there are plenty of examples, including Williams v. B. Miller from New York, of instances where manufacturers have been alleged to have contributed, to have aided and abetted a violation by a dealer. And that case has been allowed to go forward. There's not a due process issue that inheres in that. Justice Alito? There are some very interesting technical legal issues in this case. Approximate cause, aiding and abetting, how much do you have to plead in a complaint. And you and Mr. Francisco have briefed and argued those very well. It's very helpful to the court. I just thought I would ask you a question that may be on the minds of ordinary Americans who hear this argument or learn about the case. Mexico says that U.S. gun manufacturers are contributing to illegal conduct in Mexico. There are Americans who think that Mexican government officials are contributing to a lot of illegal conduct here. So suppose that one of the 50 states sued the government of Mexico for aiding and abetting illegal conduct within the state's borders that causes the state to incur law enforcement costs, public welfare costs, other costs. Would your client be willing to litigate that case in the courts of the United States? Justice Alito, I think we would have to accessorize that hypothetical with what I assume are a lot of the things that are built into it, that there are no forum and venue questions and that the kinds of allegations are specific. And talk about specific harms to the states. Would your client say, whoa, sovereign immunity, you can't sue us on this? Or would you be willing to litigate all the documents that would apply if the government of Mexico were not entitled to sovereign immunity? Justice Alito, under Pfizer, of course, Mexico is entitled to come in and the petitioners on amici point this out, to come into this case just like any other litigant. There are, of course, differences if Mexico is brought in as a defendant. So I can't and certainly don't feel comfortable giving away things like sovereign immunity on behalf of the government of Mexico. Well, I understand that. So the argument basically is it's a one-way street. The government of Mexico can sue U.S. manufacturers here for harm caused in Mexico, but one of the states here can't sue the government of Mexico for harm caused in the United States. I don't think it's entirely accurate to call it a one-way street. And if the street is one way, it's because Pfizer and other decisions from this court have said that when a sovereign comes into this court as a plaintiff, it is treated exactly like any other plaintiff, no more and no less. Thank you. Thank you. Justice Sotomayor? Justice Kagan? Justice Kavanaugh? I just want to pick up briefly on questions Justice Thomas was asking. Would your theory of aiding and abetting suggest that manufacturers should be concerned if their products, their lawful products, are sold in certain communities or certain neighborhoods where they're more likely to be misused? We manufacture knives, but there are a lot of stabbings in certain neighborhoods. We should make sure our products aren't sold there or a sporting goods company and baseball bats are used to storm CVSs or what have you, so we shouldn't sell in this city. Or prescription drugs are misused in a certain area, so we need to be alert and make sure. Is that where your theory of aiding and abetting leads, that you have to be kind of tracing everything down the chain and make sure we're not selling in these places or it's not ending up in the places where it's more likely to be misused or a certain percentage, to go to the Chief Justice's point, are being misused? Justice Kavanaugh, I think what you've described would qualify under Twitter as general awareness. It would not qualify as specific culpable participation. If you had a manufacturer... You know, you make baseball bats and you know they're being used in a particular way in particular areas by particular gangs and you should... So therefore, you know, we've got to make sure that we're not selling to those sporting goods stores that are in particular neighborhoods. I think that the first lawyerly response is that guns and drugs tend to be treated differently than things like knives and baseball bats, but even that aside, if you knew that your baseball bats were being sold into a particular pharmacy and this has happened, of course, in the opioid cases, were being sold into a particular pharmacy at, you know, in a small town at numbers that were simply insustainable and you knew that you were continuing to sell after being told by the federal government that you were selling into a rogue dealer and you continued to sell into that dealer, then yes, you would have a problem. Thank you. Justice Barrett. Justice Jackson. But do you concede that you would have a problem or not depending upon how the statute is worded? I mean, we're in a statutory scheme here. We're not just doing aiding and abetting liability as a matter of common law. Don't you agree? I do agree with that, Justice Jackson, but I think the fact that we're in a statutory scheme is an important element of centering this case where it is now. That's why I said earlier, we are at the beginning of the beginning of the... Oh, I understand. I just... Just quickly in response to what Justice Kavanaugh was just exploring with you, the facts that he laid out seemed to me to be covered by this particular PLCA immunity. That Congress looked at that situation and said, the term qualified civil liability action, which you can't bring in court, means a civil action resulting from the criminal or unlawful misuse of a qualified product by the person of a third party. So in other words, Congress started with Justice Kavanaugh's example. You know, my product is being used by third parties in criminal ways, and they said immunity. They said immunity. They said... And so to read the exception to that as essentially capturing the same facts, if you know that your product is going to these people, seems odd to me. Justice Jackson, what Congress said was immunity unless, and the predicate exception that we've been talking about says immunity unless the manufacturer is alleged, among other things, to have aided and abetted violations of federal gun laws. Thank you. That's the important point. Thank you, counsel. Thank you. Rebuttal, Mr. Francesco? Thank you, Mr. Chief Justice. Just a few points. First, Justice Thomas, as to one of your questions, if they're right under PLCA, this would in fact be the exact same lawsuits that PLCA was meant to prohibit. If you look at Texas's, Mexico's complaint, the underlying torts alleged, which is what they're seeking relief on, are the exact same torts that were at issue in all of the other cases. The violations only come in in their effort to get around PLCA and fit with one of its exceptions. But if you accept their interpretation of the PLCA exception, you will have revived exactly the same type of lawsuit that PLCA was meant to prohibit when they adopted the statute in the first place. Secondly, my friend talked about some paragraphs in their complaint, but I think that their complaint makes quite clear what their basic aiding and abetting theory is. Paragraph 228, and this is an allegation that they repeat throughout, each defendant's policy is to sell its guns to any and all federal firearms licensees. That is anyone that the federal government says that we can sell to. So their allegation is that we're treating all retailers exactly the same. We're not treating any one better than any other. We're treating them the same. That's important because in Twitter, the court made quite clear that the reason they didn't get across the aiding and abetting line was because there was no allegation that they were treating ISIS, who they knew to a metaphysical certainty was on their platform. They weren't treating ISIS any better or worse than any other customer. Instead, they go on, and this is paragraph 110, to explain their theory. A manufacturer of a dangerous product is an accessory or co-conspirator to illicit conduct by downstream actors where it continues to supply, support, or assist the downstream parties and has knowledge actual or constructive of the illicit conduct. I think that's the mere knowledge theory that my friend was just referring to, Justice Kavanaugh. That, however, is the theory that the court squarely rejected in the Twitter case. Turning to foreseeability, Mr. Chief Justice, there was an exchange with my friend on the case law where I think what I heard her say was that an intervening independent act didn't break the chain if it was foreseeable. Well, I would say that that is completely inconsistent with this court's repeated statement that foreseeability alone isn't the standard. It's also completely independent. With the Hemi Group case, that did not involve a derivative injury. New York City was the only plaintiff that could sue for the lost taxes that New York City suffered. There was absolutely no other plaintiff that would have been able to pursue that remedy and that loss, yet this court held that the intervening independent act did break the chain. Lexmark is no different. It did not involve an intervening independent act. If I trick consumers into not buying my competitor's products, I've directly harmed my competitor. There's no intervening independent act. As to the various treaties, I would agree, Justice Sotomayor, with your suggestion that the law and the verbal formulations here are kind of a mess, but if you actually look at the cases that the treatises cite for their assertion that foreseeability alone is the standard, they don't cite this court's cases, which is kind of surprising if what they're supposed to be doing is describing the law rather than making the law, but the cases that they do cite principally involve special relationships, like a landlord-tenant relationship or a teacher-student relationship. They don't cite any case in which a manufacturer has been held liable because some criminal unlawfully misuses its product to harm somebody else. My friend, again, emphasized the Washington Post article. I would urge you to read that article from beginning to end. I think it's very helpful in illuminating how even their theory of mere knowledge doesn't make sense. My friend also talked about three pistols sold by Colt with Spanish-named firearms. The notion that selling a Spanish-named firearm is what gives rise to joint purpose with cartels under the aiding and abetting statute is as wrong as it is offensive. There are, after all, millions of perfectly law-abiding Spanish-speaking Americans in this country that find those firearms very attractive, and making those firearms available cannot possibly cross the line into aiding and abetting liability. But even if it could, the notion that selling three Spanish-named pistols is the proximate cause of cartel violence in Mexico is, frankly, absurd, and I don't think it comes even close to establishing Twombly's plausibility standard. My final point is just to step back and talk about what PLACA was really about. At the end of the day, PLACA is about protecting Second Amendment rights. It's not just about protecting the manufacturers, the distributors, and the retailers, but it's protecting the right of every American to exercise their right under the Second Amendment to possess and bear firearms. That right is meaningless if there are no manufacturers, retailers, and distributors that provide them in the first place. We ask that you reverse. Thank you, Counsel. The case is submitted.